OPINION OF THE COURT
Myrna Martinez-Perez, J.
CHRONOLOGY OF CASE
On April 9, 1991 the Commissioner of Social Services (hereinafter CSS) filed the instant proceeding alleging that respondent Leonard M. sexually abused his sons, Michael and Dennis, ages 10 and 8, respectively, by fondling their genitals and buttocks in violation of Penal Law § 130.65. The Commissioner also alleges that the children are psychologically and emotionally impaired as a result of the pattern of domestic violence witnessed in the parental household. The petitioner additionally asserts a claim of educational neglect claiming that the children are excessively absent and do not attend school regularly.
Fact finding was commenced on November 18, 1991 but had to be adjourned on December 20, 1991 and February 6, 1992 because the mother claimed illness. On February 26, 1992, fact finding was again interrupted to consider a joint application by the Law Guardian and the Commissioner pursuant to Family Court Act § 1027 for a removal of the children from the mother based upon the mother’s failure to cooperate with prior court orders that the children be brought for psychological counseling, the children’s continued absenteeism from school and observed unsafe and unsanitary condition of the home. The Law Guardian informed the court that the mother missed most of the scheduled appointments with the psychologist and refused to bring the children as ordered, stating that as a nurse she did not see the need for the children to attend.
Based upon the Law Guardian’s representation, the court’s *100 own observation of the mother’s demeanor and oftentimes erratic behavior in court, the court directed a psychiatric evaluation of the mother. At the hearing, Dr. Michael Sullivan testified that the mother suffered from a psychotic disorder characterized by marked disturbance in her thinking pattern. He believed the mother was unable to think rationally, and he further opined that respondent mother was incapable of carrying out the court’s prior orders directing that the children undergo psychological counseling.
Andrea Dickerson, the caseworker, testified that on several days she observed the condition of the home as chaotic and in a constant state of disarray with doors off hinges, broken staircase banisters, broken glass picture frames, dog feces in the bedroom and the smell of urine. The children reportedly were observed on the roof of the house; they refused to attend school and do not respond or listen to their mother.
At the conclusion of the hearing this court issued an order of removal, finding that the children’s emotional, psychological and physical well-being was then in imminent danger of being impaired because of the mother’s refusal to bring the children to counseling and therapy. The fact finding was then continued on April 30, May 8, May 18 and concluded on May 23, 1992 after which counsel was directed to submit memoranda of law. All memoranda was submitted by July 22, 1992. After consideration of the relevant and material evidence presented, and weighing the testimony and assessing the credibility of the parties and witnesses, the court makes the following findings of fact.
FINDINGS OF FACT
(a) Sexual Abuse
The court finds that the allegations of sexual abuse have not been proven by the quantum of proof necessary under article 10. In order to sustain a finding of sexual abuse, this court must make a threshold finding that the father’s acts were done for the purpose of sexual gratification. Because sexual abuse is predicated upon the sex offenses defined in the Penal Law,[1] evidence of "intent” is an essential element under *101 article 10. (Matter of Ruth L., 126 Misc 2d 1053,1057 [Fam Ct, Monroe County 1985].)
Dr. Anne Meltzer was the Commissioner’s only witness on the sexual abuse charge. Dr. Meltzer was the validator chosen to access the children’s allegations of sexual abuse. She has been qualified as an expert. Dr. Meltzer testified that Michael and Dennis both confirmed several instances over a period of two years where the father had fondled the boys’ genitals both over and under their clothing and had squeezed and rubbed their buttocks when sitting or reclining on the sofa. The incidents usually occurred when the mother was out of the house.
The children could not specify the number of times such touching occurred or the amount of time that elapsed between such touching. However, the boys did relate that the touching was usually brief and that long periods of time would pass between such instances. According to Dr. Meltzer, the children denied any other form of sexual contact such as having to touch their father’s genitals, or digital penetration.
While conceding the acts alleged, the father strenuously denies that the touching was done for sexual gratification. He related to Dr. Meltzer that he touched the boys and pulled or grabbed their genitals and buttocks when he hugged them or played with them, and it was his way of being affectionate with his sons. He also related to Dr. Meltzer that during that period of time he sometimes showered with the boys. However, no allegations of improper touching while in the shower have been made against the father.
Testifying on his own behalf, the father admitted that he grabbed the boys’ genitals and buttocks during times he wrestled with them on the floor or on the sofa. He stated that as a child, he had been similarly touched on the buttocks and had not considered it wrong. He acknowledged that he has now come to realize that such touching transgresses proper parental boundaries.
Although the court is urged to infer sexual intent from the factual circumstances surrounding these incidents, the court finds unpersuasive that the actions described present an unequivocal and unambiguous showing of sexual abuse. It is certainly not beyond the bounds of reasonableness to find that the father’s actions were misguided attempts to demonstrate affection, or that his behavior demonstrates a lack of understanding of child development.
*102 The Commissioner’s own witness, Dr. Meltzer, could not confirm that the acts described by the children were done for sexual gratification. In her report she stated "It is [sic] difficult to say with great certainty that these children have been sexually abused by their father, although at the very least they have been exposed to inappropriate parental boundaries”. This court is not disposed to adjudge the touching described as sexual abuse. Normal interplay between parent and child, particularly in the early stages of a child’s development often involve acts of touching, squeezing, patting, and pinching various parts of a child’s body including buttocks and at times genitalia. The difference is that what might be socially acceptable when a child is an infant or toddler, becomes less so as the child grows older and becomes more aware of himself as a separate human being. Thus, a parent’s respect for the child’s right to the privacy of his person should increase as the child grows and matures.
Some parents, however, lack this understanding in child development and persist in dealing with an older child with the same kind of intrusive handling as when the child was an infant.
This is a grey area in the parent/child relationship where claims of sexual abuse must be seriously examined, and extreme caution exercised, lest normal interaction be reported as sexual abuse. The damage that can occur to the parent/ child relationship from an erroneous finding can be enormous and long lasting.
The court has given careful consideration to the possibility that the children may have been influenced or coached by the mother. Of critical importance here is the mother’s psychological condition during the past several years. Mrs. M.’s marked psychiatric disturbance raises serious and material issues as to her direct influence and control over the children both before and after Dr. Meltzer’s interview. Each of the witnesses confirmed that Mrs. M. has, over the past five years, exhibited illogical thinking and often has been incoherent. The mother acknowledged that she showed the children video tapes on preventing sexual abuse. Although this fact alone does not indicate prompting or coaching, it is the cumulative circumstances which point in that direction.
First, the children made these allegations to a CWA caseworker only after the father had initiated a 2221 report of suspected child abuse and/or neglect against the mother. In *103 cases of sexual abuse, children usually make initial revelations of sexual abuse to a trusted parent, or relative, or friend not to a stranger. Since the mother instructed the children on preventing sex abuse long before CWA became involved with the family, and while the respondents were living together, the court finds it unlikely and improbable that the children first revealed these incidents to a caseworker, rather than to respondent mother. This raises the possibility that revelations made to the caseworker were prompted by the mother’s statements to the children. Secondly, the validator’s interview did not occur until three months after the initiation of this proceeding, regarding incidents that occurred almost two years earlier. Prior to the validator’s interview, the court had ordered supervised visitation. The mother refused to permit supervised visitation and the court was given the clear impression that the mother would not comply because she considered the father a sex abuser. The court does not credit the mother’s testimony that she has never spoken to her children regarding the father’s actions. Despite the mother’s denials, the court has observed the mother’s behavior, demeanor and outbursts during the year-long proceedings, and concludes that the mother characterized the father as a sex abuser and continuously and repeatedly made such statements to these children long before the children were interviewed by Dr. Meltzer. Given the history of physical abuse against the mother, the negative feelings of the children toward the father due in part to the domestic violence witnessed by them, the children’s protective feelings towards their mother and the mother’s own psychological problems, the court concludes that these children were influenced by the mother to view the father’s behavior as acts of sexual abuse. In her validation report, Dr. Meltzer concluded: "One cannot rule out the possibility here that these behaviors took on more negative meaning for Michael as a result of his mother possibly distorting this and labeling it as sexual abuse. The fact that these disclosures were precipitated by Mr. M. calling in a report to CWA against his wife raises the possibility that the children became more negative towards their father and began perceiving acts as being of a more abusive nature that might have been perceived more innocuously in the past. Mrs. M.’s reported emotionally difficulties could also have contributed to some distortions and creating the image of Mr. M. being a physical and sexually abusive person.”
Nonetheless, although both children may have perceived the *104 father’s actions as sexual in nature, because the mother has characterized them as such, the Commissioner has still failed to prove that the father’s actions were performed with an intent for sexual gratification.
(b) Domestic Violence
The Commissioner, however, has proven by a preponderance of the evidence that the children are neglected because of the consistent exposure to domestic violence in the parental household.
The Commissioner has offered Dr. Meltzer’s expert testimony. Dr. Meltzer opined that the children were at a substantial risk for emotional and psychological impairment as a result of the domestic conflict and violence of the parents. The children informed Dr. Meltzer that they witnessed the father beating the mother with his fists, kicking her and at one time breaking a guitar over the mother’s legs. Although no direct medical evidence was produced as to the seriousness of the resulting physical injuries to the mother, proof of the effects of such conduct upon the children was clearly presented. The children over the years have been exposed to escalating instances of physical abuse upon the respondent mother and, as a result, the children exhibited behavioral, emotional, and academic difficulties.
The children have been emotionally and psychologically scarred by the persistent pattern of domestic violence which included several instances wherein the father put a gun to the mother’s head and threatened to kill her, as well as instances wherein the children were caused to flee the home in the middle of the night during a domestic altercation. The amount of physical assault, violence, verbal obscenities and denigrating treatment the parents have exhibited towards each other have imprinted fear, apprehension, and anxiety in each of the children.
(c) Mental Impairment
The Commissioner has not made any specific allegations against the mother with respect to her psychological or mental condition. Nevertheless, this court cannot ignore the overwhelming evidence both direct and circumstantial, that the mother is mentally impaired.
The mother’s psychological problems appear to have interfered greatly with her ability to adequately care for these children and to act in their best interests. The court heard the *105 testimony of Dr. Sullivan, a psychologist, Sister Alice, a social worker, and Ms. Dickerson, the caseworker, all of whom confirm the mother’s mental impairment and inability to make rational decisions in the children’s best interest.
Sister Alice, a social worker at Good Shephard, has known the family for five years. She described Mrs. M. as a manic-depressive who exhibited disorganized thought, rapid speech and mood swings; she testified that Mrs. M. had grandiose self-image because she is a nurse, but could not function on a daily basis.
The mother’s grandiose self-image that as a nurse,[2] she is unquestionably qualified to make all major decisions affecting the welfare of her children, has pitted her against educators, psychiatrists, social workers and the court, all of whom have either recommended or directed that the mother undergo psychiatric counseling for herself and the children. Her refusal and/or inability to comply with these directives is a further indication of her willingness to substitute her own impaired judgment for that of trained professionals and the court. A finding of neglect for impairment of emotional health is warranted when a parent does not pursue a course of therapy recommended by qualified health professionals. (Matter of Ray, 95 Misc 2d 1026 [Fam Ct, Kings County 1978].)
The mother has also exhibited contradictory behavior regarding the children’s education. Although the family lived about one mile from the school, and the school buses were available to transport the children to and from school, the mother insisted on bringing the children to school herself because she distrusted the school bus operator. She then would make additional trips to the school in the middle of the day to bring the children their lunches, although presumably she could have sent the children with prepared lunches or permitted the children to eat school lunches. This resulted in the constant disruption of the children’s school day. School officials had requested that she stay away. In contrast to the mother’s excessive involvement in mundane daily routines, the mother asserts that she did not have the ability to ensure that the children attended school regularly. She would acquiesce instead to the children’s demand to stay home and would provide unplausible explanations for the excessive absences.
Thus based upon the credible evidence, the court amends *106 the petition pursuant to Family Court Act § 1051 (b) to include an allegation of mental impairment and makes a finding of neglect for impairment of the children’s emotional and psychological well-being based upon the mother’s own mental condition. (See, Matter of Ayana E., 162 AD2d 330 [1st Dept 1990].)
(d) Educational Neglect
This court finds by a preponderance of the evidence that pursuant to Family Court Act § 1012 (f) (i) (A) that both respondents neglected the educational needs of the children.
Based upon the testimony of Sister Alice and Mrs. M., as well as the testimony of Dr. Meltzer, this court finds that the excessive absences and latenesses have had a negative impact upon the children’s education and that they have been emotionally and mentally impaired by their parents’ actions.
The M. children missed a great deal of school and were often late for school. Michael and MaryAnn, despite being very intelligent, were failing in school, as a consequence of their excessive absences. Both children fell asleep in class. In fact, MaryAnn was left back in the fifth grade and Michael was in danger of being left back. Sister Alice opined that their academic difficulties were due to the emotional upheaval suffered as a result of the violence in their household and because of the parents’ improper supervision. Michael missed 59 days of school in one year. Many of these absences were due to Michael’s alleged refusal to go to school, in which the respondents acquiesced. Although Mr. M. was asleep during the morning hours because of his work shift, while the children should have been prepared for school, he failed to ensure that the children regularly attend school.
CONCLUSION
This is a family torn apart by the physical violence inflicted by the father upon the mother and by the psychiatric disorder suffered by the mother.
Based upon the totality of the credible and material evidence, the court makes the following finding of facts:
The allegations of sexual abuse are dismissed on the grounds that the Commissioner has provided insufficient corroboration to establish sexual intent pursuant to Family Court Act § 1046 (a) (vi) and (viii).
The allegations of emotional and psychological impairment *107 of the children due to domestic violence are hereby sustained against the father.
The court makes a finding pursuant to Family Court Act § 1051 (b) and (d) that a finding of neglect is warranted against the mother for the emotional and psychological impairment of the children resulting from her own mental impairment.
The allegations of educational neglect are hereby sustained against both parents
[Portions of opinion omitted for purposes of publication.]

. Penal Law § 130.00 (3) defines "sexual contact” as "any touching of the sexual or other intimate parts of a person not married to the actor for the purpose of gratifying sexual desire of either party. It includes the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing.”

. The mother graduated as a nurse in 1978 but has not been employed in the nursing profession since that time, except for sporadic months.